# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**SKYMARK PROPERTIES**
**CORPORATION, INC., et al.,**

        Plaintiffs,

    v.

**MORTEZA KATEBIAN, et al.,**

        Defendants.

_____/

          **HONORABLE DAVID R. GRAND**

          **No. 20-12372**


**HEARING ON MOTIONS 138, 155, 157, 158**
(Conducted Via Zoom Videoconferencing Software)
**Tuesday, November 23, 2021**


Appearances (Continued on following page):

Andrew Kochanowski
Sommers Schwartz
One Towne Square, #1700
Southfield, Michigan  48076
(248) 355-0300

Fred A. Schwartz
Shahady Wurtenberger
200 E. Palmetto Park Road, #103
Boca Raton, FL  33432
(561) 910-3064
  On behalf of Plaintiffs

Sean Michael Walsh
Lippitt O'Keefe
370 E. Maple Street, 3rd Fl
Birmingham, MI  48009
(248) 646-0109
  On behalf of Defendants
  Katebians, Morrow, 2638168,
  Flemington, Samuel,
  Sahebdivanis, Behrouz

        -   -   -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard*
*Detroit, Michigan  48226*
*(313)234-2604 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

*Hearing on Motions 138, 155, 157, 158*
*Tuesday, November 23, 2021*

Appearances (Continued):

Robert A. Weisberg       Maureen A. Harrington
Carson Fischer            Greenfield
4111 Andover Road West      55 S. Market Street, #1500
Bloomfield Hills, MI  48302   San Jose, California  95113
(248) 644-4840            (408) 995-5600
   On behalf of Green Lake

                        Doron Yitzchaki
                        Dickinson Wright
                        350 S. Main Street, #300
                        Ann Arbor, Michigan  48104
                        (734) 623-1947
                          On behalf of Peter Chang

-   -   -

**I N D E X**

Motions Hearing                                    Page

Motion No. 138 ...................................4

Motion No. 155 ..................................16

Motion No. 158 ..................................26

Motion No. 157 ..................................31

Discovery Timeline .............................43

Certification of Reporter ......................54

-   -   -

**E X H I B I T S**

***None Offered or Received***

-   -   -

*20-12372; Skymark, et al. v. Katebian, et al.*

*Hearing on Motions 138, 155, 157, 158*
*Tuesday, November 23, 2021*

1    Detroit, Michigan

2    Tuesday, November 23, 2021

3    2:04 p.m.

4    -    -    -

5    (Call to Order of the Court.)

6    **THE CLERK:**  The Court calls Case Number 20-12372,

7    *Skymark v. Katebian*.

8    **THE COURT:**  Thank you.

9    If we could have appearances of counsel starting with the

10   plaintiffs.

11   **MR. KOCHANOWSKI:**  Good afternoon, Your Honor.

12   Andrew Kochanowski and Fred Schwartz for the plaintiffs.

13   **MR. WALSH:**  Good afternoon, Your Honor.  Sean Walsh

14   on behalf of the defendants other than Green Lake and

15   Peter Chang.

16   **MS. HARRINGTON:**  Good afternoon, Your Honor.

17   Maureen Harrington on behalf of Defendant Peter Chang.

18   **MR. YITZCHAKI:**  Good afternoon, Your Honor.

19   Doron Yitzchaki on behalf of Defendant Peter Chang.

20   **MR. WEISBERG:**  Robert Weisberg for Green Lake.

21   **THE COURT:**  All right.  Thank you.  And we're here on

22   this slew of motions that I have before me.  I have read

23   everything and issued some preliminary orders already, as you

24   are aware.  I saw there was another filing I think that came in

25   today that I had a chance to read so I'm up to date on

*20-12372; Skymark, et al. v. Katebian, et al.*

*Motion No. 138*
*Tuesday/November 23, 2021*

Page 4

 1  everything, and we're just going to take them one at a time.
 2      The first motion is Number 138.  This is the Katebian
 3  Defendants' motion to restrict the disclosure of documents to
 4  not the, not the plaintiffs, but to I guess some of the
 5  individuals who are affiliated with the plaintiffs.
 6      As I said, I have read everything.  I'm really not looking
 7  for -- to rehash everything that's been briefed, but if there's
 8  anything that anyone wanted to highlight or add, you could do
 9  so briefly at this time starting with the moving party.
10      **MR. WALSH:**  Thank you, Your Honor.  Sean Walsh on
11  behalf of the Katebian Defendants.  It is our motion, and I
12  guess all I want to add is that several of the comments by
13  plaintiffs have been well taken, and I, shortly before the
14  hearing, sent an email to plaintiffs' counsel suggesting that
15  we agree to enter a very simplified protective order that
16  simply restricts the disclosure to third parties and prohibits
17  the use of anything gained through the litigation for any
18  purposes other than this litigation.
19      **THE COURT:**  And when you say "third parties" though,
20  are you including in that Mr. Missaghi or not?
21      **MR. WALSH:**  I'm including any third parties, but my
22  suggestion was that disclosure would be permitted provided they
23  agreed to be bound by the Court's protective order.
24      **THE COURT:**  I see.  Okay.  All right.  Thank you.
25  Mr. Kochanowski, with that type of approach, does that resolve

*20-12372; Skymark, et al. v. Katebian, et al.*

1   this motion?  In other words, can you -- will your side agree

2   to --

3       **MR. KOCHANOWSKI:**  Sorry, Your Honor.  I'm sort of on

4   a remote so we may have a little delay here.

5       Yeah, we got that -- Mr. Walsh sent that over a couple

6   hours ago.  I guess on the surface it looks like a reasonable

7   suggestion.  I'd like to see where we go with the scheduling

8   order, and, assuming that, you know, we have got general

9   discovery, it would make sense to me for all parties to agree

10  to a simplified protective order because we'll be producing

11  documents as well and we have the same interests as Mr. Walsh

12  in that respect.

13      So I think that what we ought to do is discuss a

14  simplified, basic protective order to do exactly what Mr. Walsh

15  says, use documents for this case and so on, and so that's my

16  only comment.

17      **MR. WALSH:**  And I have no objection to that process,

18  Your Honor.

19      **THE COURT:**  All right.  Very well.  And, frankly, I

20  was, I was not inclined to grant the specific relief requested

21  in the motion in terms of limiting or prohibiting kind of on a

22  blanket basis Missaghi from -- or Ms. Alizadeh from seeing any

23  documents in the case, especially given that none of the --

24  there had been no specification as to which documents were or

25  were not covered by any sort of confidentiality concerns, and I

*Motion No. 138*
*Tuesday/November 23, 2021*

Page 6

1   just don't think that there had been an adequate showing of

2   good cause for the need of that type of a blanket prohibition

3   on the sharing of information.  And I also note that the

4   defendants -- or the Katebian defendants in their motion

5   indicate that the plaintiffs are allegedly controlled by

6   Mr. Missaghi and/or Ms. Alizadeh such that it -- at least based

7   on that it really would not be appropriate to blanketly

8   prohibit them from reviewing documents.  So the Court will deny

9   that aspect of the motion.

10      A lot of the motion though was based on concerns about

11  litigation abuse by Mr. Missaghi, and it really detailed some

12  communications that I find very concerning, and they are

13  communications that I am not saying that these have been

14  determined to be authentic.  I think that the plaintiff in its

15  response brief hinted that it may contest the authenticity of

16  some of these, although it really wasn't very specific, so I

17  think for now the appropriate thing for me to do is just voice

18  the Court's concern about these types of communications and

19  indicate what my expectations are particularly in light of the

20  order that I issued the other day about the plaintiff's use of

21  a doctored photo in a deposition and everything that was

22  related to that so -- and my, my overall concern is that this

23  litigation be used only for proper purposes.

24      The Court exists to provide a forum for litigants to have

25  their legitimate disputes resolved.  We don't exist to provide

*20-12372; Skymark, et al. v. Katebian, et al.*

1   a landscape for a full war or some sort of running man type

2   game for one side's sinister enjoyment, and so many of the

3   communications that I'm about to just reference briefly

4   certainly suggest that the Court is well within its rights to

5   be concerned that that might be one of the goals of

6   Mr. Missaghi here.

7       And I start with his July 20, 2018 email. And, again, I

8   understand not all of these have been authenticated. At the

9   same time Missaghi has not specifically disavowed any of them,

10   to my knowledge. And he indicated that he was only going to

11   stop suing Katebian "when I know that there is nothing left,"

12   and "just when it's almost over, I will start a new one." So,

13   again, that to me suggests not just trying to resolve disputes

14   but something beyond that.

15       He then, with respect to Petrilli, indicates, "First you

16   backstab me and betray me with Homewood, then I now see that

17   your assistance and full cooperation with the" -- I won't even

18   say the characterization of the Katebians, he used a derogatory

19   term to refer to them -- "is in full support." Again, more

20   derogatory terms, and then it says, "Welcome to the show."

21       Again, this isn't some sort of show. This isn't some sort

22   of game. We're here to, as I said, resolve legitimate

23   disputes.

24       And he did something very similar with respect to

25   Ms. Sahebdivani, where he says, "Anyhow, these battles are in

1    the past.  The war is about to begin, and I needed the time to

2    plan it out."  Again, same type of concerning verbiage from my

3    perspective.

4         And then, lastly, with this Mr. Mehta, and he says, "Your

5    [sic] a truly funny dude.  I like the way you go about life and

6    your bullshit.  It fits right into Bangladesh culture.  I'm

7    looking forward to seeing you in person.  It will be a very fun

8    and comical time.  I'm sure of it."

9         He goes on to say, "Except the silence you have been under

10   will unravel in this chess game you have become a part of.

11   Except none of you know how to play the chess game.  Because

12   chess players think about the future and their next moves."

13        And so, again, all of that, especially coupled with what

14   we saw at the deposition with the use of the photograph and

15   some of the other issues, which are, at least at this point,

16   not quite as clear-cut as the photograph, but they all, again,

17   point to this concern the Court has about the misuse of this

18   litigation process, and I'm not going to stand for it, and I'm

19   certainly not going to be chastised by any of the parties

20   indicating that this case has become a circus when the

21   contributions to any kind of circus are very clear.

22        So the Court will, as I said, deny the motion that was

23   filed, but the -- I do think it's appropriate, in light of all

24   of that evidence, to make very clear to the plaintiffs -- and I

25   will do this in the order that I issue -- that any action taken

*Motion No. 138*
*Tuesday/November 23, 2021*

*Page 9*

1    by them or their agents that threatens or intimidates a witness

2    or a party to this litigation or that abuses this litigation

3    process for any kind of improper purpose is going to result in

4    the imposition of an appropriate sanction, and that could be up

5    to and including the dismissal of the plaintiff's claims with

6    prejudice.  And so that's how I'll handle that motion.

7        All right.  Now we can move on to the next motion before

8    the Court, which is Number 155, and that is plaintiff's motion

9    for an order related to the prior motion to compel.  It looked

10   like part of that had been resolved and I guess part

11   unresolved, but let me give an opportunity, Mr. Kochanowski, to

12   you to address any issues you wish to with respect to that

13   motion.

14       **MR. KOCHANOWSKI:**  Yes, Your Honor, and before I do

15   that though I would like to just put on the record a couple of

16   things from the plaintiffs' counsels' perspective because we

17   are in a difficult situation with Mr. Missaghi's various

18   communications.  We want to make absolutely clear we don't

19   represent Mr. Missaghi, and we have not represented

20   Mr. Missaghi, and Mr. Missaghi is, to our thinking, not a party

21   in this case.  We have not been a party to those

22   communications.  Mr. Missaghi didn't seek our advice.

23       I have heard informally he contests that some of those

24   communications are not his.  Certainly the July 2018 I believe

25   is his.  That communication has been out there for three years

*20-12372; Skymark, et al. v. Katebian, et al.*

*Motion No. 138*
*Tuesday/November 23, 2021*

*Page 10*

1   as plaintiffs have been learning about what actually happened,

2   and some of the events of this case happened six, eight months,

3   a year or two after that communication.

4       I am aware that Mr. Mehta and Ms. Sahebdivani are also

5   parties in various fraud litigations brought by various other

6   companies owned by Alizadeh in Canada.  There has been -- at

7   least some of the litigation that the Court is seeing the

8   result from the In Re: Comfort Capital litigation that I think

9   we gave the Court back in April may have included Mr. Mehta in

10  it or Ms. Sahebdivani.  So to that extent I think that

11  Mr. Missaghi is possibly addressing other cases in Canada that

12  are ongoing.

13      With having said that, I want to assure the Court that --

14  I'll speak for Mr. Schwartz on this as well.  We have

15  absolutely made it very clear that we don't intend to be

16  involved in litigation where this kind of stuff occurs and so

17  on and so forth.  So we're with the Court on this.  We, as

18  counsel, have no intention and no interest in litigating these

19  kind of communications.  We don't believe they are client

20  authorized or they represent the client's viewpoint or

21  interest, and that is, unless Mr. Schwartz wants to add to

22  that, that is something I want to state on the record because I

23  found that the, the doctored photo event highly disturbing and

24  have no wish to have it rebound on us professionally, in

25  addition to on the client's interest in this case.

            *20-12372; Skymark, et al. v. Katebian, et al.*

1      **MR. SCHWARTZ:** I would add one thing, Your Honor, if

2 I may, and forgive me for breaking in. One of the problems we

3 have in this case is verifying documents, and that's apparently

4 on both sides. We have asked continually of the Katebian

5 defendants to provide us documents in native format so that --

6 and even as to the contested or possibly contested text

7 messages and certainly as to emails and other documents. If we

8 could get documents in native format, we could verify from whom

9 they come and when they were created and how they were created.

10 We haven't been able to get that, and we're seeking now,

11 particularly with some of the issues you raised in your order,

12 Judge, to get native format documents so that everything can be

13 fully verified. We've gotten no documents in native format in

14 the so-called 80,000 pages of discovery provided by the

15 Katebian defendants even though the Federal Rules of Civil

16 Procedure now provide for documents to be provided in native

17 format.

18      So that's one of the -- and that's not as an excuse. It's

19 as an explanation of how going forward we want to make sure

20 that everything is 100 percent real, correct documents, not

21 created documents.

22      **MR. WALSH:** Your Honor, may I offer two thoughts in

23 response?

24      **THE COURT:** Go ahead.

25      **MR. WALSH:** Number one, assuming for purposes of

         *20-12372; Skymark, et al. v. Katebian, et al.*

*Motion No. 138*
*Tuesday/November 23, 2021*

Page 12

1   argument here that Mr. Missaghi is not the client, not an

2   owner, not a representative of these plaintiffs, I fail to

3   understand why a single discovery document is provided to

4   Mr. Missaghi and why that has to happen.

5       Number two, I understand plaintiff's contention regarding

6   native format documents, but what that says to me is that they

7   understand how to authenticate documents and purposefully then

8   neglected to do so with what they presented as to

9   Mr. Katebian's supposed arrest and interrogation.

10          **THE COURT:**  Well, the difference is that they did say

11  how they got those documents.  They said that they got the

12  Katebian arrest documents from the Iranian government website

13  and that they were authentic, and in fact they referred to the

14  federal rule of evidence.  They were actually off one.  I

15  believe it's 902, and they referred to 903.  But, at any rate,

16  those documents are essentially self-authenticating subject to

17  your side's opportunity to disprove the authenticity.

18          But, you know, the big problem here is that all I see is

19  essentially every side's position is that the other side's

20  documents are fabricated.  We heard it here just today,

21  Mr. Kochanowski saying that Mr. Missaghi's contention is that

22  some of these emails are fabricated and not legitimate, and I

23  know those aren't even necessarily part of the case.  It just

24  kind of exemplifies the issue, and your clients, Mr. Walsh,

25  they say that all of these business records are fabricated and

            *20-12372; Skymark, et al. v. Katebian, et al.*

1   arrest records are fabricated, and the plaintiffs also refer to

2   certain documents as being "fake."  I mean there's so much of

3   it in the briefing that it's impossible -- and, to boot,

4   neither of you seem to like to cite to evidence when you brief

5   and so it's just paragraph after paragraph after paragraph of

6   what you say happened and what your clients say happened with

7   no citation to any record evidence whatsoever, and then all

8   each side does is in response say, no, those are all lies and

9   those documents are all fake, frauds and fabrications.

10        So it's just a very -- it's very unfortunate.  I have

11   never seen litigation like this.  It makes it very difficult

12   for the Court to get its arms around, you know, what's going on

13   here, and -- but, at least with respect to the documents that

14   you raise, Mr. Walsh, there is an authenticity kind of path,

15   and I don't understand why your clients are just now

16   essentially saying, well, we're going to look into this because

17   those issues were raised many months ago.  So, frankly, it

18   doesn't look good for any of your clients, for either the

19   plaintiff's clients or the defense.

20        **MR. WALSH:**  Your Honor, one correction.  The arrest

21   document did not come from an official website.  It came from

22   Mr. Missaghi through some Iranian source, and I was not

23   referring to the business records, Your Honor, simply the

24   arrest documents, and I --

25        **MR. SCHWARTZ:**  Mr. Walsh is correct, Your Honor.  The

1    arrest records came through the Iranian police, but the

2    business records are on numerous websites, including U.S.

3    Government websites.

4         **THE COURT:**  Okay.  Right.  I'm sorry.  The business

5    records are the ones that came from the Iranian Government

6    website; correct?

7         **MR. SCHWARTZ:**  Correct.

8         **THE COURT:**  The arrest records, the plaintiffs are

9    now saying, well, we will just wash our hands of those;

10   correct?

11        **MR. SCHWARTZ:**  Correct.  They are irrelevant and

12   should not have been raised.  We apologize for even bringing it

13   up at one point.  They are not relevant to the case.  But the

14   business records certainly are, particularly since the

15   defendants deny they have ever been in any of these business.

16        **THE COURT:**  So the problem is maybe they are not

17   directly relevant, the arrest records are not directly

18   relevant, but in a case like this where everyone's position is

19   the other side's evidence is fabricated, the fact that these

20   arrest records were created and offered for use in a

21   deposition, even if they are now withdrawn, it just raises very

22   serious questions about the legitimacy of all of the evidence

23   and particularly where, as I said, the other side's position is

24   they are all, they are all fake.

25        So, you know, I don't know -- you know, we just -- we need

             *20-12372; Skymark, et al. v. Katebian, et al.*

1   to get to the bottom of all of this and have this case decided

2   on, on the actual records, although I don't know how that's

3   ever going to happen when, when everyone's position is that the

4   other side's evidence is fake.  It's just, you know, really,

5   really unfortunate to be in this kind of situation, but we are

6   and so we have to move forward and we have to allow you all to

7   attempt to gather the relevant records and authenticate them

8   properly under the law, and the other side can object to them

9   if it believes they are objectionable, and, you know -- who

10   knows? -- maybe eventually some jury will have to decide whose

11   records are legitimate and whose are not, but that's certainly

12   not the most ideal way to litigate a case.

13         **MR. WALSH:**  Your Honor, one point, too.  The

14   relevancy of the arrest records derives from the original

15   accusation in October of 2020 where the suggestion was that

16   Mr. Katebian was arrested in Iran with over $1 million in U.S.

17   Currency.  In a money laundering case alleging money into and

18   out of Iran, that's highly relevant.

19         **THE COURT:**  All right.  And, you know, as I said, if

20   nothing else, it's all wrapped up in the poor way in which this

21   race is being litigated.  But, you know, I still have to decide

22   these motions, and, you know, the case still has to move

23   forward and kind of let the chips fall where they do.  But it

24   just should be -- if it's not already, it should be clear by

25   now that I am not going to make decisions in this case based on

*20-12372; Skymark, et al. v. Katebian, et al.*

*Motion No. 155*
*Tuesday/November 23, 2021*

*Page 16*

1  accusations, based on evidence that is clearly of questionable
2  authenticity, based on -- based on assertions of fact that are
3  not supported by evidence.  It's not going get anyone anywhere,
4  and, frankly, that's probably a large part why we're still here
5  now instead of further along.  But hopefully that's clear now
6  as to what my expectations are to move this case along.

7          So let's get back to the motion that's here.  Is it
8  accurate, Mr. Kochanowski, that Number 119 and your proposed
9  order as to 119 is truly unopposed so that we can put that
10  issue to bed?

11          **MR. KOCHANOWSKI:**  We thought so, Your Honor.  That's
12  the motion concerning the Canadian letters rogatory evidence.
13  We thought it was unopposed.  Mr. Schwartz and I talked to
14  Mr. Walsh, and then we filed the proposed order, and the
15  response, from what I understand, and certainly in later
16  proceedings, was that Mr. Behrouz, Rouzbeh Behrouz and his
17  company were not going to withdraw their objection in Canada.
18  The effect of their objection in Canada is simply that the
19  Court won't issue any of the other orders compelling the Duca
20  Credit Union and other financial institutions to generate the
21  financial records that we have been asking for, and the court
22  will hear that motion subject to Mr. Behrouz's and his
23  company's objection I believe still on February 1st, and that
24  will just be the initial, I think, hearing on that.

25          So to that extent I think it was opposed, and our position

*20-12372; Skymark, et al. v. Katebian, et al.*

*Motion No. 155*
*Tuesday/November 23, 2021*

*Page 17*

1   is all of those records are something that should have been

2   produced by Mr. Katebian or Mr. Sahebdivani on behalf of

3   themselves, and one or the other or both have an interest in

4   First Line Canadian, but they have not produced any of those

5   records either.  So, as we say in similar motions, we don't

6   have a single page of records, financial records, what happened

7   to the money both before -- after it left the Flemington and

8   Morrow bank accounts in the U.S. and went to Canada, and we

9   don't have any of the predecessor records as to the monies that

10  we believe went from Canada to abroad one way or another.  I

11  mean none of that has been produced.  So that's the best answer

12  I can give you on that.

13          **THE COURT:**  All right.  Mr. Walsh, where does your

14  client stand on that issue?

15          **MR. WALSH:**  As to First Line Canadian, we agree, and

16  we don't have a dispute that First Line Canadian will produce

17  what is requested.  In fact, I received yesterday the Duca

18  financial records that have been requested.  They are being

19  uploaded to DISCO and are being produced.

20      The only disputes, such as it were, was, as to

21  Mr. Rouzbeh Behrouz, we agreed that we would produce him for

22  deposition, which we did, and he was deposed.  Mr. Behrouz had

23  not agreed to withdraw the objections to the balance of the

24  letters rogatory as to Majestic, and we continued to speak with

25  him about that issue.  But, again, we do not control him.

*20-12372; Skymark, et al. v. Katebian, et al.*

1    But, as to First Line Canadian, we agree.  The documents

2  not only should be but are being produced, and as soon as they

3  are uploaded to DISCO, which regrettably is, at least in part,

4  out of my control because I provide them to the company to

5  upload them.  As soon as they are available, they will be

6  produced.

7          **MR. KOCHANOWSKI:**  I think that the problem is,

8  Your Honor --

9          **THE COURT:**  Go ahead.

10          **MR. KOCHANOWSKI:**  The problem there is the continuing

11  objection of Mr. Behrouz and his company --

12          **THE COURT:**  He's not a party to this case.

13          **MR. KOCHANOWSKI:**  I appreciate that, but we have

14  offered a partial solution to, to defendants that First Line

15  Canadian and the plaintiffs in Canada jointly submit an order

16  to the Court that says the only preserve -- the only objection

17  is to the nonparties and that the Court can issue the letters

18  rogatory on the financial institutions, which are broader than

19  Duca, to obtain the information.

20    And we, we thought we agreed to that procedure three weeks

21  ago or so, and it hasn't happened.  And so if we can have an

22  order that says that is a proper procedure so that the Canadian

23  court can look at 90 percent of the letters rogatory, and we'll

24  worry about Mr. Behrouz and Majestic, you know, separately,

25  then that would at least partially solve the problem.  But this

1    has been an ongoing issue for, for I think three or four months

2    now, and so that's why we -- we'd like to put it to bed

3    ourselves, and that procedure, I'm told by Canadian counsel,

4    should work, but it requires cooperation from, from First Line

5    Canadian, whoever actually controls that.

6        **MR. WALSH:**  Your Honor, to be absolutely clear, the

7    agreement was, as to First Line Canadian, we had agreed to

8    withdraw the objection to the letters rogatory in Canada, and I

9    have instructed Canadian counsel to do that.  I don't have a

10   great explanation for why they haven't done that yet, but the

11   fact is I spoke to my clients and said, regardless of what they

12   are doing, we have to produce these documents, and they have

13   secured those documents and sent them to me.

14       **THE COURT:**  All right.  And you have instructed the

15   Canadian counsel to withdraw the letters rogatory in Canada as

16   to First Line Canadian?

17       **MR. WALSH:**  That's correct, Your Honor.

18       **THE COURT:**  All right.  With that, and the fact that

19   the First Line Canadian documents are being produced, there's

20   nothing else for the Court to order as to that particular

21   issue.

22       **MR. KOCHANOWSKI:**  On the letters rogatory, correct.

23   It does not -- it does not resolve the question of Canadian

24   records and emails and so forth about these transactions that

25   are in the possession of the parties, which the Court ruled

*20-12372; Skymark, et al. v. Katebian, et al.*

1  they have an obligation to produce directly.

2       **THE COURT:**  But I thought they -- I thought Mr. Walsh

3  said those are being produced.  Of course, the ones that are in

4  the parties' possession, they are obligated to produce those as

5  part of discovery.  It has nothing to do with the letters

6  rogatory.

7       **MR. WALSH:**  Agreed, Your Honor.

8       **THE COURT:**  Exactly.  Go ahead, Mr. Kochanowski.

9       **MR. KOCHANOWSKI:**  Well, but, but what I heard

10  Mr. Walsh say is he now has the Duca financial records in his

11  possession.  I don't know for how many years or what not, but

12  that's fine.  That's only a portion of the other -- of the

13  records that were being sought on the Canadian side of the

14  financial transaction that we have.

15      Just to give the Court a flavor, the Bank of America

16  records that we had from a served subpoena showed probably a

17  half a dozen intermediary financial institutions that through

18  the monies that went through the BOA record, BOA accounts, went

19  to or through Canada.  There are probably half a dozen

20  different --

21       **THE COURT:**  You cut off.  A half a dozen different

22  what?

23       **MR. KOCHANOWSKI:**  Financial institutions in Canada.

24  So it's a much broader range of records than just the Duca

25  financial records.  Mr. Katebian said he had a personal account

1   and he had a company account there so I don't know what's

2   being, what's being -- you know, what Mr. Walsh is proposing

3   that he has, but I'll say it right now today there has not been

4   a page produced of anything from these defendants relating to

5   Canadian transactions, their communications with each other and

6   all of those things, and that stands today.

7           **MR. WALSH:**  Your Honor, if I may, I had not yet

8   addressed what was and was not being produced by the parties.

9   I was simply referring to the letters rogatory issue as it

10  related to First Line Canadian.

11          As to the parties, I instructed, and they have performed

12  now, a search of all of their email, text, WhatsApp, other

13  accounts and electronic devices using the search terms

14  requested by plaintiffs and have forwarded to me the documents

15  that were derived from that search.

16          As they relate to individual accounts in Canada, the

17  plaintiffs did not submit document requests for the individual

18  defendant's accounts in Canada.  They submitted requests for

19  company accounts in Canada, and they are all being produced.

20          **THE COURT:**  We need you to produce everything that

21  you have been provided so far by your clients.

22          **MR. WALSH:**  It is in the process of being uploaded to

23  DISCO.  That should be a space of about two days, three at the

24  most.  Once that is completed, I can do a privilege review, and

25  they will be produced.  It should not be more than a week from

*20-12372; Skymark, et al. v. Katebian, et al.*

*Motion No. 155*
*Tuesday/November 23, 2021*

Page 22

 1    today at the most.

 2         **THE COURT:**   All right.  So I do think that we are

 3    kind of conflating issues here in terms of these Canadian

 4    companies and Canadian banks that are kind of just now coming

 5    to light that were I don't think encompassed within -- well,

 6    they were part of the letters rogatory, I guess, but not -- I

 7    don't know -- not directly sent to the defendants.

 8         Part of what we're doing here today is getting a

 9    scheduling order in place at least as between the plaintiffs

10    and the Katebian defendants.  I'll address the issue with

11    respect to the other defendants at the end.  And so I mean

12    eventually all of these documents are going to need to be

13    produced.

14         To the extent that they are now identified and we can zero

15    in on them, you know, all the better, but I don't see -- I

16    guess I don't see awarding any kind of additional relief as to

17    the letters rogatory portion right now based on everything I

18    have heard today.  It sounds like the only real remaining issue

19    as to that is this Rouzbeh Behrouz situation, and he's not a

20    party and so I can't compel, you know, anything as to him.  And

21    I did though make sure that the plaintiffs had an opportunity

22    to depose him, and he has been deposed.  So I just -- I don't

23    think there is anything else we need to compel at this point

24    with respect to the letters rogatory.

25         All right.  The second part of the issue -- and this is

                *20-12372; Skymark, et al. v. Katebian, et al.*

*Motion No. 155*
*Tuesday/November 23, 2021*

*Page 23*

1    one of the things I was referencing before.  Let me pull this

2    up just quickly.  This is -- I'll share the screen just for a

3    second.

4         All right.  Can everybody see that?

5         This is, this is the second issue in plaintiffs' motion

6    that we're considering now.  It's starting at Page ID 7615, and

7    we're now looking at these other materials that it says that,

8    while they did receive about 80,000 pages of documents, there

9    were no emails/texts/messages, et cetera, between the

10   defendants, no emails/texts/messages concerning the operation

11   of the shell companies Morrow and Flemington, no bank account

12   information, et cetera.

13        Mr. Walsh, at least as to what you indicated just a moment

14   ago about your clients now having conducted a search and

15   provided you with documents, do those documents address these

16   particular issues and their searches, address these particular

17   issues?

18        **MR. WALSH:**  Your Honor, they will, and, more

19   importantly, the statement is not true.  There have been emails

20   produced.  Texts, I don't have a present memory of texts on

21   that topic having been produced, but, yes, what I instructed my

22   clients to do was to search everything using the terms that

23   plaintiffs supplied, and that captures Morrow, that captures

24   Vistamar, that captures the Florida property, that captures

25   Adepoch, Medimax.  Every term that they requested, we used.

*20-12372; Skymark, et al. v. Katebian, et al.*

1    **THE COURT:**  All right.  And so all of the documents

2    that we're looking at here where Mr. Kochanowski's clients were

3    saying we have not received these yet, those are the ones that

4    you are telling me right now will be produced within a week?

5        **MR. WALSH:**  They are included within there.  There

6    are some of them that have been produced already

7    notwithstanding the contention.

8        **THE COURT:**  All right.  And then what about this

9    next -- what about this next category where we're talking about

10   this other company for the first time, V-g-e-n-c-o, and this

11   individual Vahan, last name Khandanyan?

12       **MR. WALSH:**  Khandanyan I think is how they pronounce

13   it.

14       **THE COURT:**  Are your clients producing documents,

15   emails, correspondence, et cetera, relating to these issues?

16       **MR. WALSH:**  Yes, Your Honor.

17       **THE COURT:**  Okay.  And, again, within a week even --

18   I mean I want to be clear.  It's Thanksgiving.  I wouldn't

19   order you -- you know, I would give you a reprieve of those few

20   days if you need it, but if you're telling me you can do it

21   within a week, that's great.

22       Is that accurate?  Your clients are going to produce all

23   of these documents within a week?

24       **MR. WALSH:**  Two-part answer, if I might, Your Honor.

25   First, yes, my clients have conducted the searches and sent to

*Motion No. 155*
*Tuesday/November 23, 2021*

Page 25

1  me everything derived from those searches, which includes

2  Vgenco, Aratta, Khandanyan, all of those topics.  They are

3  being uploaded.

4      I will confess.  I have not searched them all to ensure

5  that they appear to be comprehensive, and perhaps we push this

6  to the end of next week to allow me to do that in the event I

7  need to tell them do a better job and get it back to me.

8          **THE COURT:**  All right.  I just, you know, with it

9  being Thanksgiving -- I kind of hate to sua sponte offer you

10 more time, but it is Thanksgiving, and I would rather, rather

11 just plan ahead, rather than with get a motion for additional

12 time.

13         **MR. WALSH:**  I appreciate that, Your Honor.

14         **THE COURT:**  Given how much time has elapsed and given

15 how much I'm understanding that you are doing and your clients

16 are doing even if it is late in the hour, a few extra days is

17 not the biggest deal.

18     So my order as to this is going to be that we discussed it

19 all on the record, that it was represented that all of these

20 particular, you know, specific factual issues that the

21 plaintiffs have raised in this filing, that the searches using

22 the plaintiffs' provided search terms have been undertaken and

23 that documents, responsive documents will be produced by the

24 end of next week.  Okay?

25         **MR. WALSH:**  Thank you, Your Honor.

       *20-12372; Skymark, et al. v. Katebian, et al.*

1    **THE COURT:**  All right.  So that is helpful.  So we

2  can end -- that revolves that entire motion.

3    All right.  So now the only other motions that we have are

4  these two motions for sanctions that were filed by, filed by

5  plaintiffs, one just a few days after the other.  I don't know

6  why we would have two seriatim like that, but, Mr. Kochanowski,

7  where do things stand on these?

8    **MR. KOCHANOWSKI:**  Well, I think you have just

9  resolved -- Your Honor has just resolved the one that -- and I

10  confess, I don't have them in front of me either, what number

11  it is, but the one that has to do with the Canadian records and

12  the shell company records particularly, what I would call the

13  transactional records motion, which traces the money -- which

14  traces the money from the BOA account and attempts to find out

15  where it came from to buy the Extensia note.

16    So when I hear Mr. Walsh's comments that that motion is

17  actually resolved in the sense that they will produce those

18  records and therefore my relief, which was let's accept -- we

19  would like the Court to accept these conclusions as true, well,

20  we're not going to get that relief.  So I think that once we

21  see what they actually produce, then, then we can see -- and we

22  learn where it came from particularly, what accounts were the

23  defendants', what devices they searched, hopefully that all

24  will be clear, then that motion I think is resolved.

25    But the one that --

    20-12372; Skymark, et al. v. Katebian, et al.

1    **THE COURT:** That was the substrate one. That was

2    Number 158, which I'm looking at right now, wherein you folks

3    seek an order that the evidence they have refused to produce

4    establishes, and then it's getting into essentially the

5    plaintiffs' theory of the case with respect to all of the

6    entities and transactions that we have just discussed

7    that Mr. Walsh indicated documents will be forthcoming. And,

8    you know, it covers, as I said, the Vgenco, Aratta Partners,

9    Medimex, Medimax, the $550,000 transfer to Duca Financial

10   Services records, the Canadian records that show this "monies

11   transferred among and between Canada, U.S. and Iran."

12   So I agree with the Court's ruling as to 155 that will

13   also resolve that one, although, you know, without prejudice,

14   and we'll just have to see what the, what the records show, and

15   hopefully there are no further disputes about which records are

16   and are not authentic because these are all the records coming

17   from the defendants, although I know that the plaintiffs'

18   position has been that some of those -- some of the records

19   that the Defendants have proffered, the plaintiffs' position is

20   those are "fake" so I guess we'll just need to see.

21   **MR. KOCHANOWSKI:** Well, I think, Your Honor, that --

22   just for the record because Mr. Walsh did say, when he was

23   describing what was being produced, that we did not seek, you

24   know, non-Duca Canadian records, and I think that's inaccurate.

25   And I'm looking at our Request for Production Number 1 appended

*20-12372; Skymark, et al. v. Katebian, et al.*

1  to 158 for I think several of the defendants, and Request For

2  Production Number 1 asks for bank or other account statements

3  for the period 2017 to the present relating to -- and it lists

4  a lot of things, including any account you maintained in the

5  United States or Canada, any bank account you maintain on

6  behalf of any third party so -- and then we list all of the

7  companies and so on.

8        So I think we were clear that each of the Defendants, the

9  Katebians, Mr. Beliz [sp] and Mr. Behrouz and those companies

10  that they formed, that's the Canadian records or U.S. records

11  that we were seeking.

12        **MR. WALSH:**  Your Honor -- and, I apologize, I have to

13  respond.  Request Number 1, Subrequest 7, asks for "any bank

14  account you maintain in the United States or Canada."  Number 8

15  says, "any brokerage account you maintain in the United States

16  or Canada."  9 says, "Any bank account you maintain on behalf

17  of any third party."  That is not a request for each of the

18  individual defendants' bank accounts in their own names in

19  Canada.  It's simply not.

20        **MR. KOCHANOWSKI:**  Well, I'm sorry, I'm reading --

21        **MR. WALSH:**  Maybe we're reading different things.

22        **MR. KOCHANOWSKI:**  I'm reading from Page -- it's 158.

23        **THE COURT:**  I can't hear you, Mr. Kochanowski.

24        **MR. KOCHANOWSKI:**  It's 158-3, Page ID 8269.  This is

25  requests to admit, production and interrogatories, directed to

      *20-12372; Skymark, et al. v. Katebian, et al.*

*Motion No. 158*
*Tuesday/November 23, 2021*

*Page 29*

1  Morteza Katebian.  And the Item Number 1 in Requests to Produce

2  on Page 8272, going to 8273, asks for "any account you maintain

3  in the United States or Canada," and then 8, Subsection 8, "any

4  bank account you maintain on behalf of any third party."

5      So I thought that was relatively clear, and I think we

6  asked for those parallel for Mr. Payam Katebian and

7  for Ali Behrouz as well because I don't see why we would not

8  have, and I don't have those directly in front of me.  So

9  that's where that came from.

10      **THE COURT:**  This document is a request for production

11  not related to the letters rogatory; correct?

12      **MR. KOCHANOWSKI:**  That's correct.

13      **THE COURT:**  And have you ever received formal

14  responses to these requests to produce and the interrogatories?

15      **MR. KOCHANOWSKI:**  About two weeks, two or three weeks

16  ago we received a set, yes.  It was four months later or so.

17  They were singularly unhelpful, I have to say, but we decided

18  against -- because, in light of the all of these motions, we

19  decided to try to tackle it via meet and confer, and I think

20  Mr. Schwartz started that process.

21      But the answer, the answer to the Court's question is yes,

22  we have a set of answers.  They either say, well, we're looking

23  for them or makes somewhat evasive answers, and so we have not

24  tackled that as a discrete discovery issue, you know, via

25  motion.

*20-12372; Skymark, et al. v. Katebian, et al.*

1    **MR. WALSH:**  Your Honor, I have to confess, and this

2    is my error, the request attached to Docket 158 does not match

3    the request that I received, which I'm looking at right now,

4    where Number 7 says, "Any bank account you maintain in the

5    United States."  It does not say "or Canada."  And I don't know

6    if there is an issue with regards to having received different

7    versions, but I'm looking at the version that I received, and

8    I'm happy to share the screen, Your Honor.

9            **THE COURT:**  Sure.  Go ahead.

10           **MR. WALSH:**  Right here is the request that I

11   received, and this is the request directed to Payam, and they

12   are identical to Morteza Katebian and Ali Behrouz, and Number 7

13   says "any bank account you maintain in the United States."  And

14   if I'm mistaken, I'm happy to be corrected, but that's what I

15   received.

16           **THE COURT:**  Scroll up and see what the document is.

17   All right.  Is it any -- the one that we were looking at

18   previously I believe was to --

19           **MR. KOCHANOWSKI:**  Morteza.

20           **THE COURT:**  Morteza, which I don't know if they are

21   different or not, and I don't know if you just maybe,

22   Mr. Walsh, assumed they were identical, but from my

23   perspective, you know, the defendants are producing documents

24   now.  They are gathering them.  They are doing them the right

25   way in terms of submitting them to the DISCO service. I don't

 1  want us to get bogged down in, okay, if there was an issue --

 2  I'm sure there will be lots more motion practice yet to go in

 3  the case.  And so if there's a discrete issue where a category

 4  or multiple categories have not been adequately addressed, you

 5  know, you can do meet and confers on those, hopefully address

 6  them on your own, and, if not, obviously plaintiffs remain free

 7  to file new motions as necessary.

 8       **MR. WALSH:**  Your Honor, to be clear, I'm not pointing

 9  it out to suggest that we would not produce those things, but

10  merely that we should not be punished had we not produced them

11  thus far.

12       **THE COURT:**  All right.  Well, as I said, I am not

13  ordering sanctions about any of this right now.  I just want to

14  get this on track with the documents and with minimizing the

15  areas of dispute.

16       **MR. WALSH:**  Understood, Your Honor.

17       **THE COURT:**  All right.  So that takes care of 158.

18  155 is the -- I'm sorry, 157 is the other motion for sanctions,

19  which relates to the Iranian documents -- correct? --

20  Mr. Kochanowski?

21       **MR. KOCHANOWSKI:**  Yes, Your Honor.

22       **THE COURT:**  Okay.  And this one -- this is very

23  concerning because I just don't know what to make of this when

24  the plaintiffs are saying, you know, we got these Iranian

25  records off the official Iranian governmental website, which I

*20-12372; Skymark, et al. v. Katebian, et al.*

```
 1   guess is similar to what I might do here if I wanted to look up
 2   certain filings of corporate records.  I can go to the Michigan
 3   service and find out who owns what, and, you know, if there are
 4   proof of service issues and what not, and it strikes me like,
 5   okay, they have got something similar in Iran, and the
 6   plaintiffs have identified specific businesses that seem to be
 7   owned by the Katebian defendants or certain of the Katebian
 8   defendants, and then the Katebian defendants in their
 9   depositions just say, no, we don't have any idea what they are
10   talking about and those documents must be fabricated.  And so,
11   I don't know, I'm not here to make a decision on that, but I
12   just don't understand what the defense doing then to get to the
13   bottom of it and kind of where we go from here.
14        Mr. Kochanowski, it's your motion.  Is there anything else
15   you wanted to add?
16        MR. KOCHANOWSKI:  Well, yes, Your Honor, because the
17   position that we have taken, and we have shared these documents
18   with defendants really literally for -- I think we dug them up
19   in December.  We started showing them in January of this year,
20   and the response has always been the same, that the real
21   question is, for purposes of substance in this case, is did
22   Behrouz -- stepping back a little bit -- who supplied the money
23   to buy the Extensia financial note in order to, in order to
24   then foreclose against the plaintiffs on the property and
25   obtain the Georgia property?  At least part of the case.
```

*20-12372; Skymark, et al. v. Katebian, et al.*

1    The defendants really gave us no answer for months and
2    months, but the clues that we had was that Ali Behrouz was
3    identified as either the lender or the investor or both on the
4    Green Lake -- with respect to that loan, and a portion of the
5    Green Lake loan went to repay $550,000 to Ali Behrouz.  That's
6    on the Green Lake document.
7        And then we ran across -- then we ran across an email
8    written by Mr. Chang to Mr. Payam Katebian which said, you told
9    me -- and I'm paraphrasing but not very much -- you told me
10   that the money came from the Katebians and a Canadian/Iranian
11   alloy [ph].  And, you know, that was part of the emails we got
12   from I believe the law firm that represented Green Lake in the
13   due diligence.  Or it could have been also Harrison -- the
14   Coleman law firm that represented the Katebians during due
15   diligence.
16       So we started looking for, quite particularly, what
17   businesses did the Behrouzes have in Iran going back a number
18   of years, and we found I think four or five, and it's unclear
19   because some looked like they kind of split off from each
20   other.  That's why it's unclear exactly how many, but -- and
21   then we hired an Iranian law firm to go and make sure that we
22   had the certified versions of them, which we could not obtain
23   from that website, and the Iranian law firm did come back with
24   a report and embedded what I think are the certified versions
25   of an Islamic law of the record.  So in the midst of -- and we

*20-12372; Skymark, et al. v. Katebian, et al.*

 1  supplied all of that to the defendants, and the answer was

 2  these are all fakes, as the Court pointed out.

 3      Mr. Ali Behrouz in his deposition said, after saying these

 4  are all fakes, did say, well, we operated Pak Gostar Pishtaz

 5  company.  That's one of the companies that we're talking about.

 6  And we went back and looked at the records of Pak Gostar

 7  Pishtaz, and indeed that was a company that was set up,

 8  according to Iranian records, in 2008.

 9      And then, then we realized that we had emails from

10  Ali Behrouz on a Pak Gostar Co. email account, and then we

11  checked and found a number of other emails.  And then we said,

12  well, was this a real operational company?  And the answer

13  is -- and we gave the Court a little brief last Friday -- is it

14  appears that it was.  There are records going back 15 years of

15  the company doing business in Iran, Canada with Canadian

16  partners, Germany and possibly elsewhere, that they would end

17  up for some reason on the U.S. Department of Commerce's list of

18  either sanctioned or companies of concern, and we attached the

19  citations to that.  I mean those records are --

20          **THE COURT:**  You are cutting out a little bit.

21      **MR. KOCHANOWSKI:**  Well, so what we have from our

22  standpoint is we now have a set of at least records that show

23  that company existing since at least 2007 and a web domain

24  registration from 2004 that is still active, and the websites

25  are still active and up, you know, so we can see and references

1  to those companies -- to that company going back 15 years.  So
2  that takes us almost out of the realm of "what does the Iranian
3  corporate records website provide" and into the "what did they
4  actually do" world.

5      And what we would like to establish, and we think this is
6  what establishes it, is that the Behrouzes did conduct
7  operations in an Iranian company -- with an Iranian company in
8  Europe, in Canada with Canadian partners, with European
9  partners, German tech firms and all of that, and food.  And
10  that dovetails into now the Iranian records, which show that
11  the other three companies that we think are the Behrouzes were
12  all references to this one operational company because the
13  descriptions match, the charters match, essentially everything
14  else matches about it.  And then the --

15      **THE COURT:**  Have you gotten responses yet to the
16  written discovery regarding these issues?  Because at the
17  filing your motion you had not.

18      **MR. KOCHANOWSKI:**  We got a denial -- the only company
19  we asked about is the Morrow Company that we believe that the
20  record shows was formed in 2018 between Morteza Katebian and
21  Ali Behrouz, and that company is now listed as essentially a
22  subsidiary of or owned by one of the companies that we think is
23  the operational company.

24      So we asked about Pars Farda.  The answer we got was no
25  it's not our company, we know nothing about it, and I think

1   that's still their position today.

2        So, I mean I don't know if it's a solvable issue, but from

3   plaintiffs' perspective, if you've run an operational company

4   for 15 or 18 years and you say, well, I know nothing about it,

5   well, we'll deal with it in some fashion or another, but that's

6   where we are today.  They have simply denied all of these

7   companies.

8            **MR. WALSH:**  Your Honor, if I may?

9            **THE COURT:**  I don't know because you haven't supplied

10  me with their answer, and I know they hadn't provided it at the

11  time you filed the motion.  But like I'm looking here at

12  Interrogatory Number 3.  Let me do a share screen quickly.

13  This is for Mr. Behrouz's -- the request that went to

14  Mr. Behrouz.

15       So this is Interrogatory Number 3.  "Set forth whether you

16  own directly or indirectly" -- and one thing I want to point

17  out is this interrogatory and some of admissions and some of

18  the averments all speak about the present, and that's not

19  necessarily relevant to the claims in this case, which is what

20  happened and what was your ownership, if anything, during the

21  time in question.

22       And so I still haven't seen real clear answers to that,

23  and I still, when I read those answers, I still have a question

24  in my mind of, okay, but what about during the relevant time.

25  So, number one, I think that needs to be clarified, but that

1  wasn't necessarily the question here because it says, "Set

2  forth whether you own presently, directly or indirectly -- I

3  should say it all in present tense -- any of these entities."

4  It does say, "but anything other than an unqualified yes, set

5  forth your contention how and why the company came into

6  existence."

7      So I don't know what was said there.  I mean do you have

8  their answer before you where you could share it with me right

9  now or not?

10     **MR. KOCHANOWSKI:**  Your Honor, I do not right now.

11 I'm actually in Maine, and my server is in Detroit.

12     **THE COURT:**  All right.  Let me ask Mr. Walsh.  What

13 did your clients say in response to that question?

14     **MR. WALSH:**  They said no, they don't, they don't own

15 it and --

16     **THE COURT:**  What about the second part that says how

17 and why -- see, what I would say is if it says how and why the

18 company whose records have been identified came into existence,

19 if you had a -- if your clients had a prior ownership, then

20 they would say there, I would think, oh, well -- they would

21 know the answer to that question even though they are not

22 currently an owner.

23     **MR. WALSH:**  Your Honor, their answer was they do not

24 now and never did.

25     **THE COURT:**  Do not now and never did have an

1  ownership interest in any of those entities?

2          **MR. WALSH:** That's correct.

3          **THE COURT:** Okay.

4          **MR. WALSH:** They don't have records on the formation.

5          **THE COURT:** Then what is their explanation, if

6  anything, as to the Government records, which, as I said, under

7  Rule 902 are essentially self-authenticating. I mean it does

8  give you -- your clients the opportunity to present some sort

9  of rebuttal, but I don't think it just allows you to say -- or

10  your clients to say, no, those have got to be fake. I think

11  you have got to do more so what is going on with those?

12          **MR. WALSH:** And, Your Honor, we are doing more. Up

13  until the present time we have had to do this with one arm tied

14  behind our back because plaintiffs would not provide any

15  discovery. But the point is we did engage counsel in Iran as

16  well, and we asked that counsel to investigate the official

17  records in Iran to determine whether or not both -- any of the

18  clients had an ownership interest in either of those companies,

19  but, more importantly, whether Mr. Katebian, individually or in

20  conjunction with Ali Behrouz, had any interest at any time in

21  any Iranian business venture, and he will be providing an

22  affidavit that says no, he doesn't.

23      And please keep in mind that up until recently we were

24  also examining records of an arrest that bore the stamp -- or

25  purportedly the stamp of official Iranian government agencies

*Motion Number 157*
*Tuesday/November 23, 2021*

Page 39

 1  and would have been self-authenticating, and they were not

 2  genuine either.

 3          **THE COURT:**  I understand, and that's why I raised

 4  that, and that's why I wanted to be very clear that I am

 5  rejecting the notion that the existence of those documents is

 6  irrelevant.  At the same time the law, and I'm looking at

 7  Rule 902(3) right now, which speaks to foreign public

 8  documents, and it essentially says they are

 9  self-authenticating.  It does say at the very end, "If all

10  parties have been given a reasonable opportunity to investigate

11  the document's authenticity, the Court may, for good cause,

12  either:  (A) order that it be treated as presumptively

13  authentic; or (B) allow it to be evidenced by an attested

14  summary with or without final certification."

15          So, you know, number one, I don't know that there hasn't

16  been already enough time for a reasonable investigation.  At

17  the same time I do recognize that it was only recent that we

18  had this issue come up with respect to the photographs and the

19  arrest records, and so I think that at least some additional

20  time is warranted for the Katebians to -- the Katebian

21  defendants to put their position forward as to these issues.

22  But it's just -- I mean you can obviously appreciate the

23  position the Court is in where I'm presented with documents

24  that come not just from a second Iranian source, as was

25  indicated with the arrest record, but directly from the

*20-12372; Skymark, et al. v. Katebian, et al.*

1  government of Iran and being told, well, Judge, just -- you

2  know, they are fake.  And they are just -- I'm just giving you

3  advance warning that my sense on the law is that there has to

4  be more if your clients wish to actually challenge those

5  documents.

6          **MR. WALSH:**  There will be, Your Honor, and that's

7  what we're in the process of doing.

8          **THE COURT:**  All right.  As I said, I'm giving that --

9  I'm making that clear on the record now, that that's what my

10  explanation is, for there to be a legitimate challenge to those

11  documents under this rule of evidence.

12      So -- okay.  So getting back to our motion then,

13  Mr. Kochanowski.  I mean I obviously hear everything you are

14  saying about how this looks.  You have in this respect done a

15  good job of showing me where the documents come from, properly,

16  you know, properly supporting the document's authenticity and

17  all of that.

18      At the same time, as I just said, we have this other issue

19  that came up that is at least somewhat similar in terms of the

20  authenticity of Iranian-sourced documents, and so I don't think

21  that there's anything for me to do right now other than, as I

22  have done, put on the record this very, you know, direct

23  warning about what is and is not going to be sufficient to

24  overcome that rule of evidence.  And I mean you have the

25  answers.  You are doing discovery.  I'm going to now open the

 1  discovery process, and maybe that will allow the Katebian

 2  defendants to have a full opportunity to determine what it

 3  believes are the relevant facts regarding these issues, but,

 4  other than that, I don't know that there's any relief for the

 5  Court to provide at this time in light of the discovery

 6  responses that you have been provided.

 7      Is there anything else that you want me to consider at

 8  this point?

 9      **MR. KOCHANOWSKI:**  Well, Your Honor, I think the --

10  generally, no.  I think the Court's ruling is clear, and, you

11  know, it's, it's fine with the plaintiffs.  The more narrow

12  issue that we embarked upon and why we had this kind of

13  unilateral discovery is that, is that the Behrouzes and the

14  Katebians each submitted an affidavit that said we did not do

15  business in Iran.  We did not do business through UAE.  We did

16  not do -- we did not have a business, either ourselves or in

17  combination, and that's -- I checked their affidavits, their

18  declarations, and the existence of now not just corporate

19  records.  Anybody can file for a corporation and not do

20  anything operationally, but what we think are 15, 16, 17 years'

21  worth of an actual operation by the Behrouzes of a business

22  is -- contradicts those declarations.

23      And to the extent that we pursue the original freeze

24  assets motion, which we had intended to pursue after the

25  Court's ruling in April, and we think we have evidence both

*20-12372; Skymark, et al. v. Katebian, et al.*

1   with the [audio dropped] and with the NLCR operational records

2   that the declarations were false.  And I don't have a -- so

3   whether or not an Iranian lawyer for the Katebians submits some

4   affidavit about Morteza not having a business in Iran, with all

5   due respect, that doesn't answer the question.

6       So I guess we'll see what he has to say or what the

7   defendants have to say, but if I could ask the Court to put a

8   time limit on when, when will they come up with the answer.

9   The answer right now is Ara Missaghi somehow doctored the

10  records -- doctored the records.  That's the answer we got via

11  testimony in deposition.  I don't know if this lawyer will have

12  a better answer or what, but we should have a time limit on it

13  so that we know when we can sort of bring this issue to a head.

14  That's my only comment.

15      **THE COURT:**  All right.  Well, you know, as I said,

16  right now I only have this motion in front of me that's seeking

17  essentially a final determination as to this and the imposition

18  of sanctions.  It says that I should deem the request to admit

19  admitted and treat the failure as an admission so that's the

20  issue that's before me so I'm not going to do that for the

21  reasons I have indicated.

22      I do agree with Mr. Kochanowski that this, Mr. Walsh, it

23  looks terrible for your clients in terms of their reliance on

24  Government-issued documents that apparently anyone right now,

25  any of us could, sitting on our own servers, go to the Iranian

*Discovery Timeline*
*Tuesday/November 23, 2021*

Page 43

1 website and get these documents.  So it doesn't seem like you

2 are going to have the argument that, oh, somebody, you know,

3 made fake copies and got them in Mr. Kochanowski's hands

4 somehow and that's, Judge, what you are looking at that.

5   That doesn't necessarily mean that there isn't some other

6 explanation.  I don't know.  And, as I note, some of the issues

7 that I started with give me concern about entering any kind of

8 sanctions order in this case until I, you know, very firmly

9 understand what the reality is.  But Mr. Kochanowski's -- and

10 so that's why I'm not doing anything more at this time other

11 than issuing this warning, but Mr. Kochanowski is right, that

12 there has to be some sort of, you know, game plan here for how

13 we decide this case.

14   But I think that dovetails with my next matter, which is

15 the scheduling order in this case, and, you know, what I want

16 to do is put in place a fairly strict scheduling order that

17 essentially brings these issues to a head sooner rather than

18 later, and I don't know if it's going to come to some sort of

19 evidentiary hearing before the Court.  Frankly, I think it

20 might be leaning that way on some of these issues with respect

21 to the requests for injunctive relief.  Maybe some issues are

22 just kind of jury type issues based on at least how things have

23 been going so far, I don't know, but, you know, we need to have

24 a schedule in place that allows those decisions to be brought

25 to the Court and -- you know, in due course, but with

   *20-12372; Skymark, et al. v. Katebian, et al.*

*Discovery Timeline*
*Tuesday/November 23, 2021*

Page 44

1    sufficient factual development that were -- that the Court can

2    be rest assured that it's making its decision based on real

3    evidence.

4         That's what I want to get to now is putting the, you know,

5    that timeline together, and this now gets to the other

6    Defendants, the Green Lake defendants.  I'm going to hear their

7    motion to dismiss based on both the merits and on the

8    arbitration issue in just a few weeks so I certainly don't

9    want, while I am considering that, for the Green Lake

10   defendants to be involved in the discovery process.  I don't

11   know that that's going to be the more efficient use of anyone's

12   time and so, you know, my thought process is let's put a

13   discovery schedule in place right now that pertains to the

14   plaintiffs and all of the defendants other than the Green Lake

15   defendants.  If the Green Lake defendants remain in the case

16   and it turns out that additional discovery time is needed

17   because they were later to the game, so to speak, you know, I

18   can certainly address that at the appropriate time.

19        So, with that, let me hear first from the Plaintiffs.

20   What are your thoughts about how much time you believe would be

21   an appropriate discovery period?

22            **MR. SCHWARTZ:**  Your Honor, I had done something a

23   little different, and I apologize to the Court.  We had

24   submitted a schedule about two months, a month and-a-half ago

25   based upon the status then.  Obviously things have changed

*20-12372; Skymark, et al. v. Katebian, et al.*

*Discovery Timeline*
*Tuesday/November 23, 2021*

Page 45

1    since then.  And, as Mr. Kochanowski had told the Court at our

2    last telephone conference, it's our intention to, once

3    Your Honor rules on the motion to dismiss as to Green Lake, to

4    file an amendment incorporating, assuming Your Honor keeps

5    Green Lake in, a lot of the items that are in our supplement

6    and also adding a couple of defendants regarding the Katebian

7    part of the case.

8        What I had suggested -- what I had suggested with

9    Mr. Kochanowski earlier is that you have the hearing coming up

10    in December on the motion to dismiss and, assuming Your Honor

11    would grant -- were to deny the motion to dismiss and we will

12    then going forward to amend our complaint, I did a discovery

13    schedule based upon an amended complaint being filed sometime

14    in January with a response due around the end of January.  If

15    you want -- I can recalculate now based upon a separate track

16    of discovery for the Katebian defendants and then, you know,

17    add in the Green Lake defendants, which would move my dates

18    back a bit.

19        **THE COURT:**  I think it's important right now that we

20    have a schedule in place that allows discovery to move forward

21    with respect to just the plaintiffs and the Katebian

22    defendants.  I want to give Mr. Walsh an opportunity to do his

23    investigation into, you know, his clients' position about what

24    these documents are, how they came to be, you know, all of

25    that, and to me that's all kind of separate issues than the

*20-12372; Skymark, et al. v. Katebian, et al.*

1  ones I'm facing with respect to the Green Lake defendants so --

2      **MR. SCHWARTZ:**  May I suggest the following, Judge?

3  In light of the fact that Mr. Walsh is going to be providing

4  certain documentation by the end of next week, which is, I

5  believe, December 3rd, may I suggest that we begin general

6  discovery as to Green Lake -- I'm sorry -- as to the Katebian

7  defendants and the plaintiffs on or about December 6, which

8  would be the Monday subsequent to Mr. Walsh providing those

9  documents, and initial disclosures due on or about the 10th of

10  December, and general discovery approximately six months after

11  December 6, sometime in early June, and I would suggest then

12  that it be June 6, which is also a Monday, for the end of

13  general discovery, expert reports being required on June 13th,

14  rebuttal reports on June 27th, and expert discovery ending on

15  July 11th, dispositive motions on or about August 1st.

16      **THE COURT:**  All right.  Mr. Walsh, any thoughts on at

17  least the kind of general time frame of roughly six months of

18  discovery?  That's the main one that kind of drives all the

19  other dates.  Any problem with that kind of time frame for

20  discovery?

21      **MR. WALSH:**  No, Your Honor.

22      **THE COURT:**  All right.  Any issues with any of the

23  other -- I have my own kind of expert deadline process that,

24  you know, it's fairly close, Mr. Schwartz, to what you said.

25  It maybe builds in a little more time for the depositions and

 1    the rebuttal reports and that, but it will be in that same

 2    general time frame.

 3            **MR. SCHWARTZ:**  Thank you.

 4            **THE COURT:**  Unless anyone has anything else to add --

 5        **MR. WALSH:**  Your Honor, I'm sorry to interrupt.  I

 6    have one thing to add.

 7        I had discussed with plaintiffs and we did not reach an

 8    agreement.  I would like to see a date by which the Katebian

 9    defendants and the plaintiffs amend the pleadings without

10    leave.  The general discovery is only beginning.  The Katebian

11    defendants have not had a chance to conduct any to date, but

12    what we have found suggests that claims against these

13    plaintiffs, and, more appropriately, third parties might be

14    appropriate, and to spend time and money doing motions for

15    leave to amend seems inefficient at this point.

16        **MR. KOCHANOWSKI:**  Your Honor, we certainly did talk

17    about it, and I think we gave Mr. Walsh a very clear answer,

18    which is no.  My understanding is that he wants to resurrect

19    the dismissed case that was filed by Payam Katebian in 2018,

20    and we had told him repeatedly that we think that case is just

21    infirm legally and the statute on that would be blown anyways.

22        We have no understanding why, after all of the litigation

23    and all of the stuff that went on before in this case, they

24    didn't file any affirmative defenses, but they didn't file any

25    affirmative defenses with their answers so maybe there's a

*Discovery Timeline*
*Tuesday/November 23, 2021*

Page 48

1    reason for it, maybe there is an excuse for it, but we

2    certainly would oppose any kind of presumptive, well, you can

3    go ahead and raise whatever you want without leave of Court

4    because I think that either of those would be both futile and

5    waived, and we certainly would like an opportunity to argue

6    about whatever it is that they may think they want to amend

7    their existing position to.

8         **THE COURT:** All right. Well, at this point I'm just

9    going to enter a general discovery order that's going to govern

10   the case as it presently sits with respect to the plaintiffs

11   and the Katebian defendants. You know, obviously anyone is

12   able to file whatever motions they want subject to meeting the

13   applicable standards that apply to those motions, and I'm not

14   prepared to, you know, give any kind of advanced guidance as to

15   any of those issues right now. So we'll get that out soon.

16        **MR. WEISBERG:** Your Honor, if I might on behalf of

17   Green Lake, and I did hear the Court address -- or say that it

18   was going to address separately the Green Lake and presumably

19   Mr. Chang in connection with a scheduling order. I would like

20   to understand a little bit, however, how the Court views its

21   apparent intention to open up discovery with respect to the

22   other parties and how that is intended to either excuse or not

23   excuse the effect of that discovery on Green Lake and

24   Mr. Chang. Ms. Harrington can speak for Mr. Chang, but it

25   seems to me that the issue is the same, which is, while we feel

*20-12372; Skymark, et al. v. Katebian, et al.*

*Discovery Timeline*
*Tuesday/November 23, 2021*

Page 49

1   that we are divorced from these other parties on a practical

2   level, the allegations in connection with those parties still

3   obviously are designed to, by plaintiffs, to attach to the

4   Green Lake Defendants.  And so I'm not sure how we're really

5   protected in this process, particularly given the fact that

6   there is a suggestion being made that there will be additional

7   allegations or additional complaints that will be filed

8   depending upon how the Court rules on our motion to dismiss,

9   but if discovery is ongoing, there's no possible way that Green

10  Lake and Mr. Chang can be divorced from those proceedings, and

11  at the same time they are prejudiced by the fact that this

12  process of elongating the pleadings and elongating the

13  opportunity to file amended complaints has extended, and we're

14  sucking up mass quantities of legal dollars here in the

15  prospect that maybe we won't be in the case, but, if we are, we

16  are now being sort of, you know, theoretically protected from

17  additional discovery but really not because these processes are

18  going forward, which may very well arguably affect Green Lake

19  to the extent that they can be validated or not.

20          **THE COURT:**  Well, I guess you have a pending motion

21  to be dismissed from the case on grounds that the plaintiffs'

22  claims against your clients and Chang are subject to the

23  arbitration clause and therefore not properly before this

24  Court.  If you want to be participating in the discovery

25  process while that motion remains pending and -- that's fine.

*20-12372; Skymark, et al. v. Katebian, et al.*

 1   I thought your client might prefer to let that motion run its

 2   course and see its resolution before it starts spending a lot

 3   of time and money on discovery, but if it prefers to be

 4   encompassed within the discovery process -- I mean I'm going to

 5   hear that motion relatively soon and get our order out

 6   relatively soon thereafter -- that's fine.  I thought I was

 7   potentially doing your client a favor by not making them incur

 8   fees during the interim in the event that the motion would be

 9   granted, but I don't know so ...

10        **MR. WEISBERG:**  Your Honor, I do appreciate the

11   Court's consideration in that regard, and I'm not trying to in

12   any way limit it.  I'm just simply suggesting that, given the

13   fact, as you alluded to, that you will be ruling on our motion

14   fairly shortly, and given the fact that we're in, you know, a

15   holiday season a little bit and so presumably there will be

16   people who will not have interest in pursuing depositions

17   during say Thanksgiving or the Christmas week or what have you,

18   it seems me that if discovery in general could be delayed until

19   those rulings occur no one would be prejudiced by that and at

20   the same time Green Lake and Mr. Chang would be protected in

21   having to not incur substantial amounts of fees and costs in

22   order to protect themselves against allegations that are being

23   spewed about in connection with other parties that we don't

24   believe we're part of but, nonetheless, have an obligation to

25   defend.

*20-12372; Skymark, et al. v. Katebian, et al.*

*Discovery Timeline*
*Tuesday/November 23, 2021*

*Page 51*

 1          **THE COURT:**  Well, the problem is I want to get the

 2     discovery going with respect to the parties for whom there is

 3     no pending, you know, motion to dismiss, and while I am

 4     optimistic that I will get you a decision on the two motions

 5     that your clients have filed promptly, sometimes things happen

 6     and I'm not as efficient as I would hope to be and not as

 7     timely as I hope to be, and so while I would hope that I would

 8     get the decision out reasonably shortly after the hearing, I

 9     don't know for sure and so I don't want to have this case just

10     stagnate for however long that is and so I'm happy to -- as I

11     said, my inclination was to have this discovery move forward at

12     this point only as to the defendants -- Katebian defendants and

13     the plaintiffs.  If you're saying that you would prefer to

14     still be included, then that's fine.

15          **MR. WEISBERG:**  No, I'm not saying that, Your Honor,

16     and I think Ms. Harrington has something to say, too, before I

17     say anything further.

18          **MS. HARRINGTON:**  Just to weigh in, Your Honor, I

19     think the largest concern on behalf of the Green Lake

20     defendants is having any further depositions going forward.

21     Those are the more expensive aspects of discovery.  And so if

22     we're doing multiple depositions of the same parties to cover

23     things, that's probably the biggest concern.  I don't have a

24     particular concern with written discovery going back and forth

25     between the plaintiffs and the Katebian defendants starting

*20-12372; Skymark, et al. v. Katebian, et al.*

*Discovery Timeline*
*Tuesday/November 23, 2021*

*Page 52*

1   December 6, but if we can agree that there won't be any

2   depositions, further depositions set until after the Court

3   rules on the pending motions that will be heard December 17th,

4   I think that would take care of a lot of the concerns on the

5   part of the Green Lake defendants.

6            **MR. SCHWARTZ:**  We have no problem holding off on

7   depositions.

8            **MR. WALSH:**  I'm afraid I do.

9            **MR. SCHWARTZ:**  I thought you would.

10           **MR. WALSH:**  I don't want to do that.  A lot of the

11  discovery that I need to conduct must be conducted asking

12  witnesses questions.

13           **MR. WEISBERG:**  Nobody is precluding Mr. Walsh from

14  taking depositions ultimately, number one, and, number two is

15  the point of the discovery to date, in theory, was to be

16  limited to the freeze motion, and that's what Mr. Walsh wanted

17  to be able to oppose, I thought, at the present time.

18       So, again, I think this could be structured in a way where

19  if you want to take a deposition and it's limited to the freeze

20  motion, I'm not sure Ms. Harrington would have a problem with

21  that, but unfortunately in the past these depositions have

22  seemed to slip into a more generalized approach to the

23  questions that are being asked, and they are not limited to the

24  freeze issue itself.  As a matter of fact, to my knowledge the

25  freeze issue has been barely touched in any of the discovery.

*20-12372; Skymark, et al. v. Katebian, et al.*

*Discovery Timeline*
*Tuesday/November 23, 2021*

Page 53

 1          **MR. KOCHANOWSKI:**  I completely disagree, but --

 2          **MR. WALSH:**  And therein lies the problem.

 3          **THE COURT:**  The whole case is the freeze motion.  I

 4    mean that's -- that is the whole case, wrapped up in that.

 5          I mean I don't know, Mr. Walsh.  My assumption is that

 6    there's going to be enough discovery to be done in terms of

 7    documents and written discovery that your side's going to need

 8    to send first to Mr. Kochanowski such that I should be able to

 9    have an order out on the Green Lake and Chang motions well

10    before any, any depositions would realistically need to be

11    taken.  And so, you know, I'm just going to proceed based on

12    what I said initially.  If it comes up that there's a dispute

13    about whether a particular deposition should go forward or not

14    and you cannot agree, you know, I suppose somebody could file a

15    motion, and I would address it.

16          **MR. WALSH:**  Your Honor, may we except out of that

17    Mr. Kiani-Nijad, the affiant, the counterpart of

18    Rouzbeh Behrouz?  I would like to take his deposition sooner

19    rather than later.

20          **MR. KOCHANOWSKI:**  We have no objection to it.

21          **THE COURT:**  Ms. Harrington, any objection if just

22    that one were to move forward at this stage?

23          **MS. HARRINGTON:**  On behalf of Mr. Chang, no, Your

24    Honor.

25          **MR. WEISBERG:**  That's fine, Your Honor, on behalf of

                    *20-12372; Skymark, et al. v. Katebian, et al.*

*Discovery Timeline*
*Tuesday/November 23, 2021*

Page 54

1    Green Lake.

2            **THE COURT:**  All right, terrific.  We'll get out that

3    discovery schedule, and I'll get out orders on all of these,

4    and we'll see you in a few weeks for the hearing.  I hope

5    everyone has a nice Thanksgiving.  Thanks very much.

6            (Proceedings concluded at 3:38 p.m.)

7                              -   -   -

8                **C E R T I F I C A T I O N**

9        I certify that the foregoing is a correct transcription of

10    the record of proceedings in the above-entitled matter.

11

12    s/ Sheri K. Ward                    3/4/2022
      Sheri K. Ward                       Date
13    Official Court Reporter

14                              -   -   -

15

16

17

18

19

20

21

22

23

24

25

                *20-12372; Skymark, et al. v. Katebian, et al.*